IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:24-CR-448-5 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | WEDNESDAY, |
| | § | SEPTEMBER 25, 2024 |
| JORDAN LOPEZ | § | 10:11 A.M. TO 11:06 A.M. |

**DETENTION HEARING**

BEFORE THE HONORABLE CHRISTINA A. BRYAN
UNITED STATES MAGISTRATE JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| COURTROOM DEPUTY: | MELISSA MORGAN |
| ELECTRONIC RECORDING OFFICER: | HOPE MCFARLIN |

**THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT ORDER. UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE. General Order 94-15, United States Court, Southern District of Texas.**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

## <u>APPEARANCES</u>:

For the Government:               DOJ - TAX
                                  George Meggali, Esq.
                                  150 M Street NE
                                  Washington, DC  20002
                                  202-598-5969


For the Defendant:                DAVID ADLER, ATTORNEY
                                  David Adler, Esq.
                                  1415 North Loop West
                                  Suite 905
                                  Houston, TX  77008
                                  713-666-7576




Also Present:                     Mohammad Beollhna, Witness

                                  Crista Orphe, Pretrial

**INDEX**

| WITNESSES: | Direct | Cross | Redirect | Recross | VOIR DIRE |
|---|---|---|---|---|---|
| Mohammad Beollhna | | | | | |
| By Mr. Meggali | 6 | . | 60 | . | . |
| By Mr. Adler | . | 34 | . | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| Government Exhibit 1 | 22 | 22 | 23 |
| Government Exhibit 2 | 28 | 41 | 41 |
| Government Exhibit 3 | 28 | 41 | 41 |

\*\*\*

1   **HOUSTON, TEXAS; WEDNESDAY, SEPTEMBER 25, 2024; 10:11 A.M.**

2   (Official Interpreter utilized for translation.)

3   THE COURT:  All right.  United States versus Jordan

4   Lopez.

5   MR. MEGGALI:  Good morning, Your Honor.  George

6   Meggali, for the United States.  I'm not sure if defense

7   counsel's here.

8   THE COURT:  He was here.  He might have stepped out.

9   MALE SPEAKER:  Your Honor, he stepped out to the

10  post office real quick, he said.

11  THE COURT:  Okay.  Has this Defendant been

12  arraigned?

13  MR. MEGGALI:  Yes, Judge.

14  (Pause in the proceedings.)

15  INTERPRETER:  Your Honor, may the Interpreter be

16  excused?

17  THE COURT:  Yes, we have no one who needs an

18  Interpreter.  You may be excused.  Thank you.

19  INTERPRETER:  Thank you.

20  (Pause in the proceedings.)

21  MR. MEGGALI:  My apologies, Your Honor.  I suspect

22  that the defense might offer either the Defendant's mother or

23  the grandmother as the third party custodian.  And the

24  grandmother might --

25  THE COURT:  Oh, they may need --

1          MR. MEGGALI:  -- not speak --

2          THE COURT:  -- an Interpreter.  We may need an

3     Interpreter, so.

4          INTERPRETER:  Okay.  I'll stay.

5          THE COURT:  All right.  Mr. Adler, we are ready to

6     go forward.

7          MR. ADLER:  Yeah, I'm sorry, Judge.  I thought you

8     were going to do another hearing before me, so.

9          THE COURT:  I did, but it was probably the fastest

10    detention hearing --

11         MR. ADLER:  Yeah, I've --

12         THE COURT:  -- I've ever had.

13         MR. ADLER:  -- never seen one go by that fast. ;

14         THE COURT:  All right.  Mr. Lopez, do you want to

15    come forward and have a seat at counsel table.  And

16    Mr. Meggali, the basis of your motion for detention was what?

17         MR. MEGGALI:  3142(f)(1)(C), Your Honor.  And we

18    would assert a rebuttable presumption under 18 USC 3142(e)(3).

19         THE COURT:  Mr. Adler, you agree it's a presumption

20    case?

21         MR. ADLER:  I believe it is, Your Honor.

22         THE COURT:  All right.  You may call your first

23    witness.

24         MR. MEGGALI:  The Government calls Detective

25    Mohammad Beollhna.

1                (The oath was administered.)

2                          DIRECT EXAMINATION

3       BY MR. MEGGALI:

4       Q    Good morning.  Please state your name?

5                THE COURT:  You can pull it -- just pull it down.

6                THE WITNESS:  Mohammad Beollhna.

7       BY MR. MEGGALI:

8       Q    And please spell your last name?

9       A    B-E-O-L-L-H-N-A.

10      Q    Where are you employed?

11      A    Houston Police Department.

12      Q    And what is your position at the HPD?

13      A    Detective.

14      Q    How long have you been with the HPD?

15      A    Eight years.

16      Q    And have you become familiar with the federal criminal

17      matter involving Jordan Lopez?

18      A    Yes.

19      Q    Did you assist with executing a federal search warrant of

20      the Defendant's former home on May 14, 2024?

21      A    Yes, sir.

22      Q    Were you part of the federal investigation that led to

23      that search warrant?

24      A    Yes.

25      Q    But were you part of the underlying criminal

1  investigation?

2  A    No, sir.

3  Q    But did you review material and speak with case agents

4  associated with that investigation?

5  A    Yes, I did.

6  Q    And have you also gotten personally involved with

7  criminal matters at the state level involving the Defendant?

8  A    That's correct.

9  Q    When did you first learn of the Defendant?

10  A    I was assigned a case of an aggravated robbery at the

11  Lincoln Bar.  I'm sorry.  I was assigned a case on May 3rd, of

12  an aggravated robbery at the Lincoln Bar, and during that

13  investigation, I ID'd the Defendant as a party of the offense.

14  Q    Was the Defendant ultimately charged from that incident?

15  A    No, sir, he was not.

16        MR. MEGGALI:  And without belaboring this incident,

17  we won't dwell on it too much, can you give us a brief

18  overview --

19        THE COURT:  Well, hold on.  You need to speak into

20  your mic, Mr. Meggali.

21  BY MR. MEGGALI:

22  Q    Without belaboring it, we won't speak too much about this

23  incident but could you give us an overview summary of what

24  happened on May 3rd?

25  A    On May 3rd, the complainant was assaulted behind the

1    Lincoln Bar, and the Defendants took his property and drove to

2    a strip club and used his credit card.

3    Q    Was the victim hospitalized?

4    A    Yes, he was.

5    Q    Did you see any video footage, or speak to anyone who

6    indicated that the Defendant participated in that beating or

7    robbery?

8    A    I watched video footage from the bar.  I spoke to

9    complainants and witnesses, and I was provided with an

10   Instagram video which shows his participation in the incident.

11   Q    But the Defendant didn't -- you didn't see the Defendant

12   doing any of the beating, right?

13   A    No, sir.

14   Q    Whose Instagram were you provided?

15   A    It was the Defendant's Instagram.

16   Q    The Defendant, Jordan Lopez?

17   A    Correct.

18   Q    And who gave you that Instagram?

19   A    Witnesses at the Lincoln Bar.

20   Q    Did you see anything pertaining to the May 3rd incident

21   on the Defendant's Instagram?

22   A    There were a video that was recorded.  That video was

23   posted in Instagram.  The video shows the two Defendants that

24   were charged with the aggravated robbery bragging out the

25   incident and showing their bloody hands.

1          MR. MEGGALI:  And so were those Defendants --

2          THE COURT:  Mr. Meggali, I'm going to ask you -- you

3    can go ahead and sit down because I can't really hear you

4    either so --

5          MR. MEGGALI:  Okay.

6          THE COURT:  -- pull the microphone --

7          MR. MEGGALI:  My apologies.

8          THE COURT:  -- to you, and I think the record

9    operator's having a hard time hearing you also.  So make sure

10   the microphone's directly in front of you.

11         MR. MEGGALI:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13   BY MR. MEGGALI:

14   Q    Just take a step back.  And so you saw an Instagram, a

15   video of two individuals bragging the same night of the May

16   3rd beating, is that right?

17   A    That's right, and there was -- the Defendant was in the

18   video as well.

19         THE COURT:  The Defendant what?

20         THE WITNESS:  The Defendant was in the video as

21   well.  He was in the video, recording the bragging, and it was

22   his Instagram page.

23   BY MR. MEGGALI:

24   Q    Yes, sir.  But the Defendant didn't have any blood on his

25   hands, right?

1   A    No, he did not.

2   Q    And who were the two individuals who had blood on their

3   hands?

4   A    It was co-Defendant, Tanisu Madrigal (phonetic).

5   Q    Was there anyone else?

6   A    It was the brother of Tanisu Madrigal.  I can't remember

7   his first name.  Caleb, I'm sorry, Caleb.

8   Q    The night of that crew and right after the May 3rd

9   beating, where did they go anywhere else, after?

10  A    They drove to a strip club known as Barbie's.

11  Q    And how did law enforcement know that they went to

12  Barbie's after?

13  A    I conducted the follow up, and I drove to the Barbie's.

14  I requested video footage from the owner, and observed the

15  video footage.

16  Q    And was there anything taken from the victim to indicate

17  that the perpetrators went to Barbie's after?

18  A    It was a credit card.

19  Q    What did the credit card signal?

20  A    The complainant that was beaten up told me that his

21  credit card was used at that location, and that's what lead me

22  to drive to Barbie's and investigate it.

23  Q    And how much longer after the beating at Lincoln Bar was

24  that credit card used at Barbie's?

25  A    I would say about an hour.

1    Q    And was the Defendant at Barbie's as well --

2    A    Yes.

3    Q    -- around that time?

4    A    Correct.

5    Q    And was this Instagram page when you monitored it, was it

6    public?

7    A    Yes, sir.

8    Q    And so did you grow familiarize with his appearance

9    through monitoring that Instagram page?

10   A    I'm sorry?

11   Q    Did you grow familiar with his appearance after

12   monitoring that Instagram page?

13   A    Yes, I did.

14   Q    And did you also review Texas ID records?

15   A    Yes, I did.

16   Q    Do you see the Defendant in the courtroom here today?

17   A    Yes, I do.

18   Q    Could you please identify him by what he's wearing and

19   where he's sitting?

20   A    The gentleman in orange jumpsuit.  He's wearing orange

21   suit.

22        MR. MEGGALI:  Your Honor, may the record reflect the

23   Defendant -- the witness identified the Defendant by what he's

24   wearing?

25        THE COURT:  Yes, so noted.

1   BY MR. MEGGALI:

2   Q    Detective Beollhna, did you learn whether the Defendant

3   was arrested on May 8, 2024?

4   A    Yes, I did.

5   Q    Has he been in custody ever since?

6   A    That is correct.

7   Q    Why was he arrested?

8   A    He was involved in a home invasion.

9   Q    So let's take a step back.  Where did you home invasion

10  occur?

11  A    It occurred inside the complainant's resident.

12  Q    And that occurred in Houston?

13  A    That is correct.

14  Q    Who was there inside the home before the Defendant showed

15  up?

16  A    It was the complainant and his mother.

17  Q    Did they know the Defendant?

18  A    No, sir.

19  Q    Did you review HPD reports arising from that incident in

20  preparation for your hearing here today?

21  A    That is correct.

22  Q    If they didn't know the Defendant, according to the HPD

23  reports and the statements taken in those HPD reports, how did

24  the Defendant enter the home?

25  A    Reviewing the HPD document incident, the Defendant and

unknown female drove to the location.  The complainant heard a

knock on his door.  He looked through the peep hole, and he

observed a female that looked like she was in distress.

The complainant opened the door, and when he did, the

Defendant kicked the door open and pointed the gun at the

complainant.

Q    And so is it fair to say that the female that accompanied

the Defendant was bait to get the complainant to open the

door?

A    That's what it looked like, yeah.

Q    And according to the complainant, after he entered the

home, did he brandish a gun?

A    Yes, he did.

Q    Did he say anything?

A    He said where are the pills.  I'm going to kill you all.

I'm with the cartel.

Q    Did he end up causing any injuries?

A    He at one point struck the complainant in the head with

the back of the firearm.

Q    And when law enforcement -- was law enforcement called to

the site?

A    That is correct.

Q    Did they find the Defendant there when they arrived?

A    Yes, sir.

Q    How is it that the victims were able to call law

1    enforcement and the Defendant was still there?

2    A    From the police documented incident, the complainant

3    stated that the Defendant ordered him to get on his knees, and

4    at one point, the complainant's mother came downstairs.  She

5    observed the incident, and he ordered her to get on her knees

6    too.  The complainant stated that the Defendant at one point

7    put the firearm between his legs.  He --

8         MR. ADLER:  I'm objecting as non-responsive.  I

9    thought the question was how were they able to contact the

10   police.

11        MR. MEGGALI:  I'll break it down, Your Honor.

12        THE COURT:  Answer the question.  All right.

13   BY MR. MEGGALI:

14   Q    So you said -- you finished your last answer.  At one

15   point, the Defendant put the firearm between his knees?

16   A    Yes, correct.

17   Q    What happened next?

18   A    The complainant observed that the Defendant went to pull

19   up his pants, and then he took that chance, and tackled him

20   down and called 9-1-1.

21   Q    And so was the Defendant still subdued by the time law

22   enforcement arrived?

23   A    That is correct.

24   Q    And when law enforcement arrived, what did they find?

25   A    They found the complainant had the Defendant pinned down

on the ground.  They detained the complainant and recovered
the firearm.

Q    What kind of firearm if you recall?

A    It was a long rifle, like a Draco.

Q    Were there any bullets recovered?

A    Yes.

Q    Now as part of your prep for this hearing, did you learn
that federal investigators conducted a wiretap investigation?

A    Yes, I did.

Q    And did those investigations involve several phones
belonging to Jose Alex Lopez?

A    That is correct.

Q    And did that occur in the months of April and May, 2024?

A    Yes, sir.

Q    And as part of their investigation, did law enforcement
gain familiarity with the voices of Jose Alex Lopez?

A    Yes, sir.

Q    As well as people who called him frequently?

A    Yes, sir.

Q    Who is Jose Alex Lopez?

A    The father of the complainant.

Q    And is he also a Defendant indicted in this case?

A    That is correct.

Q    Is there anything else you can tell us about Jose Lopez
that you know?

1    A    From the information that was shared by the agent, he was

2    involved in drugs and he was arrested following FBI

3    investigation.

4    Q    Arrested on drug charges?

5    A    Yes.

6    Q    Is that your understanding?  And did you review the line

7    sheets or audio recordings of any wiretap conversations from

8    Jose Alex's phones?

9    A    Yes, sir.

10   Q    Did you review any conversation between Jose Lopez and

11   Tanisu Madrigal on May 8, 2024?

12   A    That is correct.

13   Q    Did Tanisu say anything on that conversation on May 8th,

14   corroborating the HPD reports about the May 8th home invasion

15   involving Jordan Lopez?

16   A    Yes, sir, he did.

17   Q    What are some things he mentioned regarding that May 8th

18   incident?

19   A    A synopsis from the phone conversation, Tanisu called the

20   father of the Defendant, and he told him about the incident,

21   and he described it to the T, exactly what happened and how

22   the Defendant took it upon himself to drive to that

23   complainant's residence to rob him.

24   Q    Did he mention a Draco?

25   A    Yes, he did.

1  Q    Did he mention some kind of old lady?

2  A    Yes, sir, he did.

3  Q    And what does law enforcement think that the mentioning

4  of an old lady matches the presence of the complainant's

5  mother at the site of the incident?

6  A    It matched the description of -- when Tanisu was

7  describing it over the phone as an older lady, that the

8  Defendant thought she lived alone.

9        MR. MEGGALI:  And Tanisu mentions the victim

10  wrestling Jordan to the ground?

11        MR. ADLER:  I'm going to object at this point.  I'm

12  sorry, I don't think is relevant for the purposes of this

13  detention hearing.

14        THE COURT:  What is the purpose?  What's the purpose

15  of this question?  You were talking about a wiretap on which

16  Tanisu Madrigal repeats the incidents -- the events of the

17  home invasion?

18        THE COURT:  Yes, Your Honor.  And it's to buttress

19  the credibility of the accounts that he got on the HPD

20  reports.  And so this buttresses the credibility of those

21  accounts.

22        MR. ADLER:  Judge, my client was arrested at that

23  home.  I'm not sure any buttressing is necessary.

24        THE COURT:  Yeah, he's been charged and is detained

25  so -- on those charges so I think we can move on.

1        MR. MEGGALI:  We'll move on.

2    BY MR. MEGGALI:

3    Q    Was Tanisu frustrated in that call?

4    A    Yes, he was.

5    Q    Based off your read of the line sheets, why was he

6    frustrated?

7    A    He was mad that the Defendant and Tanisu are known to --

8    his words, edging people together, and he was mad that he went

9    alone and that he cut --

10       MR. ADLER:  I'm sorry.  I'm going to object as non-

11   responsive.  The question was why was he frustrated.

12       MR. MEGGALI:  If you could just give the witness an

13   opportunity to answer, Your Honor?

14       THE COURT:  Well, go ahead and answer the question.

15       THE WITNESS:  He mentioned that the Defendant cut

16   his ankle monitor.

17   BY MR. MEGGALI:

18   Q    And so why was Tanisu frustrated that Jordan cut his

19   ankle monitor?

20   A    Because he might not get bonded out.

21   Q    And so just to summarize, Tanisu in a call with Jose

22   Lopez expressed frustration that the Defendant is unlikely to

23   be bonded out because at one point, he cut his ankle monitor?

24   A    That is correct.

25   Q    Did he do anything to verify whether he might in fact

1    have cut off his ankle monitor?

2    A    Yes, I called the district attorney, Harris County's

3    district attorney and requested to see if they have any

4    records of the Defendant's tampering with the electronic

5    monitor.

6    Q    And did the assistant district attorney assigned to his

7    case contact pretrial services?

8    A    Yes, she did.

9    Q    Did she verify that there was in fact a tamper alert on

10   his device from May 1st, to May 8th?

11   A    Yes, she emailed me that with the information.

12   Q    Did she email you, or did she email me?

13   A    Oh, she emailed you, correct.

14   Q    And that happened between -- the tamper alert happened

15   between May 1st, and May 8th, 2024?

16   A    Yes, sir.

17   Q    And although it's vaguely referred to as a tamper alert,

18   could a tamper alert encompass cutting off an ankle monitor

19   according to pretrial services?

20   A    It's possible according to her.

21   Q    And did the assistant district attorney reference a

22   possible report about that tamper alert?

23   A    Yes, sir.

24   Q    But it wasn't uploaded to a database, right?

25   A    No.

1    Q    Did the assistant district attorney indicate why that

2    report wasn't uploaded to the database?

3    A    Because it was --

4            MR. ADLER:  I'm going to object.  This is all

5    irrelevant to the purpose of the detention hearing.

6            THE COURT:  Well, I actually think it is relevant

7    because we're now talking about Mr. Lopez allegedly cutting

8    off an ankle monitor --

9            MR. ADLER:  Right.

10           THE COURT:  -- that he was wearing in state court.

11           MR. MEGGALI:  Correct.

12           THE COURT:  I find that relevant.

13           MR. ADLER:  I'm not disputing that.  I'm talking

14   about whether or not a report was uploaded about the ankle

15   monitor being cut off versus --

16           THE COURT:  Well, I think the relevance of that is

17   why I don't have anything in my -- in the pretrial services

18   report about -- I can't see anything that shows that his bond

19   was revoked, or a warrant issued or anything else.  So I'm

20   going to allow it.

21           MR. MEGGALI:  Your Honor --

22           THE COURT:  On May 8, 2024, he's got an arrest for

23   the aggravated robbery with a deadly weapon.  And I think what

24   you're telling me is he was on bond prior to May 1, 2024, and

25   the only thing that I see is this February 4, 2024 charge for

1    tampering with evidence, a felony and evading arrest, a

2    misdemeanor, and it looks like on February 16th, he was

3    confined to Harris County jail for 45 days.  But I don't see

4    anything about a bond in which he was placed on an ankle

5    monitor.

6            MR. MEGGALI:  Yes, Your Honor.  And we weren't able

7    to determine exactly what the charge that led to that ankle

8    monitor.

9            THE COURT:  Well, has anybody figured out if he was

10   actually on an ankle monitor and cut the monitor off?  That

11   would be an important fact for this hearing.

12           MR. MEGGALI:  We do know that his most recent bond

13   violation was filed May 24 -- I mean, May 1, 2024.

14           THE COURT:  May 1st --

15           MR. MEGGALI:  And --

16           THE COURT:  -- 2024, there was a bond violation

17   filed?

18           MR. MEGGALI:  Yes.  And this --

19           THE COURT:  I think you have -- I don't have that.

20           MR. MEGGALI:  I can admit it into evidence first if

21   that'll make things easier.

22           THE COURT:  Yeah, that's information I would like to

23   have, yes.

24           MR. MEGGALI:  Okay.

25   BY MR. MEGGALI:

1    Q    Detective Beollhna, when you spoke with the assistant

2    district attorney, did she provide you with several certified

3    copies of bond violations?

4    A    Yes, she did.

5         MR. MEGGALI:  Your Honor, may I approach?

6         THE COURT:  You may.

7    BY MR. MEGGALI:

8    Q    I'm handling you what's marked as Exhibit 1.  Can you

9    tell us what these are?

10   A    These are bond condition violation reports.

11   Q    And are these eight pages?

12   A    Yes, sir, eight.

13   Q    One violation per page?

14   A    That is correct.

15   Q    And were these certified copies when you received them

16   yesterday?

17   A    Yes, sir.

18        MR. MEGGALI:  Your Honor, the Government moves to

19   admit Government Exhibit 1.

20        THE COURT:  Any objection, Mr. Adler?

21        MR. ADLER:  Can I take the witness on voir dire for

22   a moment, Your Honor.

23        THE COURT:  Yes.

24   VOIR DIRE

25   BY MR. ADLER:

1    Q    Detective, do you have any information that the Jordan

2    Lopez listed on this paper is the Jordan Lopez that's sitting

3    behind me?

4    A    Yes, I spoke to the district attorney that was -- that's

5    assigned this case, and the one that's assigned, aggravated

6    robbery, and she emailed these information to Mr. George.

7         MR. ADLER:  All right.  Judge, for the purpose of

8    this hearing, I don't have an objection.

9         THE COURT:  All right.  They're admitted.  Exhibit

10   one is admitted.

11   BY MR. MEGGALI:

12   Q    If I could direct attention, Detective Beollhna, to the

13   last page.

14   A    Yes, sir.

15   Q    If you could look to the middle of the page where it

16   details the violation.  Does it say -- could you read the

17   first two sentences, after the Defendant is in violation of

18   bond conditions?

19   A    The Defendant was issued a GPS device on 04/19/2024, with

20   a curfew.  Defendant's curfew is 7:00 p.m., to 8:00 a.m.  The

21   Defendant received curfew violation on the following dates,

22   04/19, 7:26 p.m., and approved leave 04/19 --

23   Q    That's fine.  And look in the top right corner, was that

24   filed May 1, 2024?  Top right corner of the last page?

25   A    That is correct.

1    Q    And on May 1st, according to the assistant district

2    attorney, did pretrial services relinquish supervision of the

3    Defendant because an arrest warrant was issued for him on May

4    1st?

5    A    That is correct.

6    Q    And is that the reason, according to pretrial services,

7    that they did not upload the report about his potential

8    cutting off of his ankle monitor?

9    A    That is what she said, yes, sir.

10   Q    Because they relinquished supervision of the Defendant on

11   May 1st?

12   A    That is correct.

13   Q    And they said that whatever tampering report they got, it

14   occurred between May 1st, and May 8th?

15   A    That is correct.

16   Q    And did pretrial services insist on receiving a court

17   order before they provided us with that report?

18   A    Yes, sir.

19   Q    And did this conversation happen yesterday?

20   A    That is correct.

21   Q    Now are you aware of any other home invasions the

22   Defendant was likely associated with?

23   A    Yes, sir.

24   Q    And did you review HPD reports for them?

25   A    That is correct.

1    Q    Are you aware of an incident on April 24, 2024?

2    A    Yes, sir.

3    Q    Could you give us a brief summary of what happened?

4    A    On that incident, the Defendant and a co-Defendant drove

5    to the complainant's resident, assaulted him and took his

6    property.

7    Q    Who was -- so who was the main suspect in that incident?

8    A    It was Tanisu Madrigal.

9    Q    And did Tanisu already know the person whose home was

10   invaded?

11   A    That is true.  They had met at a bar.

12   Q    And how did he enter the home?

13   A    The complainant invited Tanisu to his place.  Tanisu

14   drove behind the complainant.  They got to the complainant's

15   resident, and Tanisu and the complainant went inside through

16   the garage.

17        And at one point, Tanisu told complainant, I'll be right

18   back and went outside.  Came back with two other males

19   including the co-Defendant Lopez.

20   Q    Was Tanisu masked when he returned with two other

21   individuals?

22   A    Tanisu was not masked.  The Defendant was masked.

23   Q    And did one of the complainants provide law enforcement

24   with an Instagram screenshot implicating the Defendant, Jordan

25   Lopez, based off of hand tattoos that you recognized?

1    A    That is correct.

2    Q    And did the masked robber with the hand tattoos brandish

3    a gun at the complainants?

4    A    That is correct.

5    Q    And did that masked robber with the hand tattoos, did he

6    hit one of the complainants on the head?

7    A    That is correct.

8         MR. MEGGALI:  In a manner similar to the injury

9    caused to the victim on May 8, 2024?

10        MR. ADLER:  Judge, I'm going to object, leading.

11        THE COURT:  All right.  Don't lead the witness.

12   BY MR. MEGGALI:

13   Q    Does the hitting of the complainant on April 24, 2024,

14   remind you of anything?

15   A    Yeah, it reminded me of the same M-O, when the Defendant

16   struck the complainant at the home invasion of May 8.

17   Q    And what part of his body did he strike on May 8th?

18   A    In the head.

19   Q    What did the robbers leave the site of the robbery on

20   April 24th with?

21   A    They took the complainant's vehicle.

22   Q    How many vehicles did they take?

23   A    They took two.

24   Q    Do you remember what kind of vehicles they were?

25   A    I think it was a Dodge.

1    Q    And where was one of those -- were any of those vehicles

2    ended up found?

3    A    It was located the same day near the Defendant's

4    resident.

5    Q    And are you sure that it was a Dodge?

6    A    I believe so.  I don't recall the exact model but I think

7    it was a Dodge.

8    Q    And where did the Defendant reside at the time?

9    A    2428 Bering Drive.

10   Q    Do you remember what was the address of where one of the

11   vehicles was found?

12   A    On the block of 2400 Bering Drive.

13   Q    And how do you know the Defendant lived there at the

14   time?

15   A    When we -- I'm sorry.  When we executed the search

16   warrant, I spoke to two females that were at the location, and

17   they told me that the Defendant and Tanisu stayed at that

18   resident.

19   Q    Are you referring to the May 14, 2024, search?

20   A    That's correct.

21   Q    Was the Defendant already in state custody at the time?

22   A    Yes, he was.

23   Q    Did HPD officers ever encounter that home at any point

24   before the May 14, 2024, I mean search warrant?

25   A    It was documented police report in which HPD made a scene

1    and spoke to the Defendant in that resident.

2    Q    Okay.  Was it for a crime that was alleged, or was it

3    like a welfare check?

4    A    It was a welfare check.

5    Q    So you just testified that you assisted with the federal

6    search warrant on May 14, 2024.  What was recovered from that

7    search?

8    A    Several weapons and narcotics.

9    Q    Was there anything significant about any of the weapons

10   that was recovered?

11   A    One of the weapons was an automatic weapon.

12   Q    And do you know how much, or what type of narcotics was

13   found?

14   A    100 gram.

15   Q    100 grams of?

16   A    Cocaine.

17          MR. MEGGALI:  Your Honor, may I approach?

18          THE COURT:  You may.

19   BY MR. MEGGALI:

20   Q    I'm showing you what's marked as Government's Exhibits 2

21   and 3.  Can you tell us what's Government Exhibit 2?

22   A    Two is an Instagram picture of the Defendant.

23   Q    And looking at the top left corner of Government

24   Exhibit 2, is that the same Instagram handle that you were

25   given on May 3rd, at Lincoln Bar?

1    A    That is correct.

2    Q    And do you recognize -- who do you recognize that to be,

3    this individual?

4    A    The Defendant.

5    Q    And is that also the Defendant in the second page of

6    Exhibit 2?

7    A    That is correct.

8    Q    And where was this picture retrieved from?

9    A    Well, it appeared to be the 2428 Bering Drive resident.

10   Q    What is that in his pocket, or in his pants on the two

11   pictures in Exhibit 2?

12   A    The first one shows the long magazine, or firearm, and

13   what appeared to be a switch on the top.

14   Q    And what's the color of what you're referring to as the

15   switch?

16   A    Gold.

17   Q    And is that -- does that firearm in his hand on the

18   second page of exhibit, does that resemble the same firearm on

19   page one?

20   A    That is correct.

21   Q    And what is that gold thing do you recognize it to be?

22   A    It's a switch.

23   Q    Now looking at Government Exhibit 3, can you tell us what

24   this is?

25   A    The Defendant.  This is a video -- it's screenshot that

1    was taken from a video that was posted in Instagram.

2    Q    Did you watch the video before this hearing?

3    A    Yes, I did.

4    Q    And who is this in the screenshot?

5    A    The Defendant.

6    Q    And what was the Defendant doing or saying in the video?

7    A    He was driving and displaying a firearm through the

8    window.

9    Q    And does the firearm in his hand in that video resemble

10   the same firearm in these pictures?

11   A    Yes, sir.

12   Q    Prior to your investigation here today, did you learn

13   whether law enforcement during the May 14, 2024 search recover

14   a firearm resembling this one?

15   A    Yes, I did.

16   Q    And did it have a gold switch just like the one in this

17   firearm?

18   A    That is correct.

19   Q    And was that firearm ever tested?

20   A    Yes, sir.

21   Q    And what did the test results reveal?

22   A    That it was automatic.

23   Q    And who tested it?

24   A    H-E-F.

25   Q    Now you said that 100 grams of cocaine was recovered on

1    May 14, 2024?

2    A    That is correct.

3    Q    Did you review line sheets, or listen to any calls

4    indicating that the Defendant participated in drug

5    distribution?

6    A    That is correct.

7    Q    Did you listen to any calls on May 3rd, between the

8    Defendant and his father, Jose Alex Lopez?

9    A    Yes, sir.

10   Q    What did you glean from that line sheet?

11   A    The conversation -- a synopsis of the conversation.  The

12   Defendant and his father were talking about delivering,

13   meeting somewhere.  The Defendant was stating that he had

14   licks, and the father telling him that he's got something in

15   the car.  He called it as, I have it in the car -- he had it

16   in the car.

17   Q    And based off your law enforcement training and

18   experience, what does a lick mean?

19   A    Lick is a slang that's used for narcotics and illegal

20   activities.

21   Q    Did he also ask for a zip?

22   A    Yes, sir.

23   Q    And what does a zip mean based off your training and

24   experience?

25   A    Narcotics.

1    Q    Was there any -- besides the one that we just referenced

2    between Tanisu and Jose, on May 8th, were there any other

3    calls between Tanisu and Jose Lopez on May 8th?

4    A    Yes, there was.

5    Q    Did they have any arguments on any of these calls?

6    A    Yes, there was an argument between Tanisu and the father

7    of the Defendant.

8    Q    What were they arguing about?

9    A    The father of the Defendant sounded that he was pissed,

10   that Tanisu didn't give them the -- Jordan's money.  And he

11   threatened that he was going go to his place and shoot up the

12   place.

13   Q    And so this was the same day Jordan was arrested?

14   A    That is correct.

15   Q    Did Jose ask for the work as well during that call?

16   A    That is correct.

17   Q    And based off your training and experience, what does

18   work refer to?

19   A    It's illegal narcotics.

20   Q    Now just to wrap up, during your review of HPD reports,

21   did you uncover any reports about a February 4, 2024, incident

22   between Jose Lopez -- I mean, I'm sorry, Jordan Lopez and

23   Julius Moore?

24   A    Yes, sir.

25   Q    What did you learn from the HPD reports?

A    The documented police report, in that incident, Moore and the Defendant were -- HPD was alerted about a stolen vehicle deal.  HPD set up a plan to meet up with the seller.  And while they're at the location, Defendant Moore, showed up in the stolen vehicle.  And Defendant Jordan was driving behind him.

Jordan evaded in the vehicle when he saw law enforcement at the location.  The officers got into a pursuit, and detained the Defendant.

Q    So did he end up getting charged with any auto theft, the Defendant?

A    He was charged with evading arrest.

Q    Did you review any line sheets or calls indicating that Tanisu was aware of this incident between Jordan Lopez and Moore?

A    Yes, sir.

MR. MEGGALI:  What did you glean from that line sheet?

MR. ADLER:  Judge, I'm going to object, whether another Defendant is aware of this, I don't see how it's relevant to the issue.

THE COURT:  What is the relevance?

MR. MEGGALI:  We'll move on.

THE COURT:  Okay.

MR. MEGGALI:  No further questions, Your Honor.

1          THE COURT:  All right.  So Jose Alex Lopez, who is a

2   Defendant in the case, is the father of Jordan Lopez, the

3   Defendant who is here in this courtroom, correct?

4          THE WITNESS:  That is correct.

5          THE COURT:  All right.  Mr. Adler?

6          MR. ADLER:  Thank you, Judge.

7                      CROSS-EXAMINATION

8   BY MR. ADLER:

9   Q    Detective, you said you've been with HPD eight years.  Do

10  you have any prior law enforcement experience before HPD?

11  A    No, sir.

12  Q    What's your educational background?

13  A    I have a bachelor degree.

14  Q    From?

15  A    U-T-F.

16  Q    I'm sorry, from?

17  A    University of Florida.

18  Q    Okay.

19  A    Yeah.

20  Q    I'm assuming in your eight years with HPD, you've

21  testified before?

22  A    A few times, yes.

23  Q    Okay.  And you realize the Judge here is going to make

24  her decision for this hearing today based on your testimony

25  and your credibility, correct?

1   A    That is correct.

2   Q    With that in mind, can you tell us if you've had any

3   disciplinary issues in your eight years with HPD?

4   A    No, sir.

5   Q    None at all?

6   A    No, sir.

7   Q    Okay.  I'm sorry I wasn't clear on the May 3rd assault at

8   the Lincoln Bar.  My client was not charged in that assault?

9   A    That is correct.

10  Q    And two other people who are on video with blood on their

11  hands were charged in that assault?

12  A    That is correct.  Only one of them had blood on his

13  hands, yeah.

14  Q    Okay.  But my client didn't have blood on his hands?

15  A    No, sir.

16  Q    And he wasn't charged in that assault?

17  A    No, sir.

18  Q    And there's video of those events?

19  A    That is correct.

20  Q    Okay.  At the Barbie strip club, did my client do

21  anything illegal?

22  A    Not to my knowledge.

23  Q    Okay.  The May 8th, '24, home invasion, that charge is

24  pending in state court currently, correct?

25  A    That is correct.

1          MR. ADLER:  Okay.  Judge, may I approach the

2     witness?

3          THE COURT:  You may.

4     BY MR. ADLER:

5     Q    I'm showing you Exhibit 1 which was those eight bond

6     violation sheets, right?  I think you have it.

7     A    Yeah.

8     Q    On each of those eight pages, what's the court number

9     that's listed in the upper right corner, right here, Court

10    Nine?

11    A    That is correct.

12    Q    Is that on each of those eight sheets?

13    A    Yes, sir.

14    Q    Okay.  So all of these sheets in Exhibit 1 are out of

15    Harris County Criminal Court of Law, Number nine, correct?

16    A    That is true.

17    Q    I'm going to show you the pretrial services report.  Do

18    you see where it says the federal pretrial people searched

19    federal, state and local criminal records for Mr. Alvarez, my

20    client?

21    A    Yes, sir.

22    Q    Do you see anything listed in County Court at Law nine on

23    the pretrial services report?

24    A    I think that would be -- I see 178.

25    Q    Right.  You don't see County Court at Law nine, do you?

1    A    No, sir.

2    Q    Okay.  Thanks.  The calls that you mentioned between --

3    oh, I'm sorry.  Do you know how many Jordan Alvarez's are

4    listed in Harris County district clerk's website today as

5    having pending criminal cases?

6    A    How many who?

7    Q    How many people with the name Jordan Lopez have current

8    pending cases in the Harris County's district clerk's files,

9    do you know?

10   A    Yes, when I was conducting the aggravated robbery

11   incident, I had to run every possible name that had the last

12   name of Lopez.  Yeah, there was still a lot.

13   Q    Okay.  The calls between my client and his father, I'm

14   assuming the word cocaine is not mentioned in the call?

15   A    No, sir.

16   Q    Is there a word that you believe is a code word for

17   cocaine that was mentioned in the call?

18   A    There was licks, works.

19   Q    Okay.  And licks can mean drugs you testified?

20   A    Possibly.

21   Q    But it can also mean illegal activity?

22   A    That is correct.

23   Q    Which could be non-drug related illegal activity?

24   A    Possible.

25   Q    So you don't know what they're referring to when they

1  mention the word licks?

2  A    I assumed it was narcotics.

3  Q    I get it.  But your assumption could be correct, but your

4  assumption could be incorrect?

5  A    That's correct.

6  Q    Okay.  And who actually said the word licks, if you

7  remember?  It's okay if you don't.

8  A    I do not remember.

9  Q    Okay.  And the call between Tanisu and my client's father

10  where you said my client's father was angry and was going to

11  go shoot up the place, did he actually say that he was going

12  to go shoot up the place?

13  A    Verbatim, he said I'm going to come over and insinuated

14  that he's going to shoot Tan up --

15  Q    Okay.

16  A    -- if I (indiscernible).

17  Q    I get it.  Was my client a participant in that phone

18  call?

19  A    No, sir.

20  Q    Do you have any information that my client knew about

21  that phone call?

22  A    Yes, sir.

23  Q    Okay.  How do you know my client knew about that phone

24  call?

25  A    There was a jail recording conversation between the

MOHAMMAD BEOLLHNA - CROSS BY MR. ADLER

1    Defendant, Jordan, and Tanisu.  In that conversation, Tanisu

2    was venting to the Defendant about what the Defendant's father

3    said.

4    Q    Okay.

5    A    So he does know about it, yeah.

6         MR. ADLER:  All right.  That's all the questions I

7    have, Your Honor.

8         THE COURT:  All right.  What was the address that

9    you said the two females at that address said Mr. Jordan

10   Lopez, where he resided which was -- it's 2428.  What is the

11   name of the street, could you spell it, please?

12        THE WITNESS:  Bering.  It's B --

13        THE COURT:  Oh, Bering, okay.

14        THE WITNESS:  Yeah, Bering.

15        THE COURT:  And that was -- you got that information

16   on the -- on March 14, 2024.  That's when the search warrant

17   was executed, is that correct?

18        THE WITNESS:  That is correct.

19        MR. MEGGALI:  My apologies, Your Honor.  So the

20   Judge is asking about March.  Is it March, or --

21        THE COURT:  I'm sorry.  I meant to --

22        THE WITNESS:  May.

23        THE COURT:  -- say May.  Thank you.

24        All right.  Do you have any Redirect, Mr. Meggali?

25        MR. MEGGALI:  Brief Redirect, Your Honor.

1          THE COURT:  All right.  And while that's happening,

2    has pretrial done any looking into these bond violations to

3    determine whether these are Mr. Jordan Lopez who is seated

4    here?

5          MS. ORPHE:  Yes, ma'am.  I could pull them up.  His

6    date of birth matches the ones that I'm looking at in here so

7    that is him.

8          THE COURT:  Okay.  All right.  Thank you.

9          All right.  Go ahead, Mr. Meggali.

10          MR. MEGGALI:  Brief Redirect, Your Honor.

11                    REDIRECT EXAMINATION

12    BY MR. MEGGALI:

13    Q    Detective Beollhna, were you with me when I initially

14    called the assistant district attorney?

15    A    Yes, we called her together.

16    Q    Was she on speaker --

17    A    Yes, sir.

18    Q    -- during the phone call?  When I brought up Jordan

19    Lopez's name, did she already know that he and Tanisu Madrigal

20    were associates?

21    A    Yes, she had signed the same pages.

22    Q    And so did she email me, herself, the bond violation

23    reports that you reviewed today in Exhibit 1?

24    A    That is correct.

25    Q    Did you review an audio recording or a line sheet where

1    Jose told Tanisu the day Jordan was arrested, that he was

2    going to pick up the work?

3    A    Yes, sir.

4    Q    And in another call, did Jose Lopez and Tanisu talk about

5    flushing down the work?

6    A    That is correct.

7    Q    And based off your training and experience, what does

8    work refer to?

9    A    Narcotics.

10            MR. MEGGALI:  No further questions, Your Honor.

11            THE COURT:  All right.  Anything further, Mr. Adler?

12            MR. ADLER:  No, Your Honor.

13            THE COURT:  All right.  You may step down.

14            THE WITNESS:  Thank you.

15        (Witness steps down.)

16            THE COURT:  All right.  Any other witnesses,

17    Mr. Meggali?

18            MR. MEGGALI:  No, Your Honor.  I don't remember if I

19    moved Exhibits 2 and 3 into evidence, and so I do so now.

20            THE COURT:  All right.  Any objections to Exhibits 2

21    and 3 --

22            MR. ADLER:  No.

23            THE COURT:  -- the photographs?  All right.  Those

24    are admitted.  So Exhibit 1 has been admitted, Exhibits 2 and

25    3 have been admitted.  I take judicial notice of the pretrial

1    services report on Mr. Lopez.

2            Do you have any witnesses, Mr. Adler?

3            MR. ADLER:  I do not, Your Honor.

4            THE COURT:  All right.  I'm ready for argument.

5            MR. MEGGALI:  Your Honor, we'll move past the

6    incident at Lincoln Bar.  We won't dwell on that.  We'll start

7    with the May 8th home invasion.  The Defendant's here in your

8    courtroom here today, Your Honor, because he was writ'd over

9    from state custody.

10           And he landed in that state custody because after he

11   barged into a stranger's home, there was a serendipitous

12   moment where he put his firearm between his legs and allowed

13   that stranger to wrestle him to the ground, and that is how

14   law enforcement were able to catch him.

15           Had that serendipitous moment not take place, the

16   Defendant would very well have been on his way right now to

17   his fourth home invasion, his fifth home invasion over a year

18   perhaps.

19           That wasn't the last home invasion that the

20   Government suspects or is certain that the Defendant

21   conducted.  A few weeks right before, April 24th, while we

22   cannot pin the Defendant beyond a reasonable doubt to be one

23   of those masked robbers who accompanied his known criminal

24   associate, Tanisu Madrigal, he's been identified by his modus

25   operandi of hitting victims on their head with a gun.

He's been identified by his unique hand tattoo.  And

the day that he was arrested on May 8th, Tanisu Madrigal was

frustrated as Detective Beollhna testified, that he ended up

going by himself instead of going with his rag tag team of

fellow criminals.

We know the Defendant dealt drugs.  He asked for a

lick from his father.  The day he was arrested, his father had

to make sure that the work was flushed, or work was picked up.

One hundred grams of cocaine was found from the home where he

was known to have resided as recently as April, 2024.

And he has been found on an Instagram that he's been

identified to use by a bystander at Lincoln Bar, an Instagram

that is publicly viewable, and where his appearance is posted

multiple times.

He's been found with a gun, with a known golden

switch identical to one tested by law enforcement recovered

from his known home on May 14, and confirmed to be an

automatic firearm.

That firearm wasn't legal then.  It's not legal now.

And his cavalier attitude towards his legal obligations and

legal constraints will not stop him from violating any bond

conditions that are placed on him today.

Any third party, potential third party custodian,

Your Honor, whether his mother or his grandmother, they did

not start being his mother or grandmother today.  They did not

1   start being his mother or grandmother after the April 24,

2   2024, home invasion.

3           They did not start being his mother or grandmother

4   after the May 8, 2024, home invasion.  And their failure to

5   protect the community and ensure that their son or grandson

6   doesn't engage in such criminality, doesn't associate with

7   such criminal associates like Tanisu Madrigal, as captured on

8   May 3rd, and so forth.

9           Their failure to prevent him from such level of

10  danger criminality isn't going to change based off of any

11  potential bond conditions that the Court places here today.

12  And so the Government submits all the aforementioned, and

13  assert he's a danger to the community and that he has not

14  rebutted the presumption of danger to the community.

15          But as far as risk of flight, Your Honor, the

16  Defendant is facing serious state charges.  The Defendant is

17  facing serious federal charges.  The weight of the evidence is

18  significant, and he's incentivized to flee.

19          He has, according to pretrial services report, not

20  graduated high school.  He is not known to have carried any

21  gainful employment or make any significant contributions to

22  the community that would tether him here.

23          And so with that, we submit that he's also a flight

24  risk, and hasn't overcome his presumption of being a flight

25  risk.  And he has a conviction on his record, and a 45 day

1   confinement sentence to prove that he is a flight risk, Your

2   Honor.

3       We would point to the February 4, 2024, evading

4   arrest conviction, and he's lucky that he walked away with

5   just an evading arrest conviction because a case could be made

6   that he participated in an auto theft.

7       We know that he participated in auto theft or was

8   tangentially involved based off of HPD reports.  Although the

9   witness wasn't able to elaborate on why he knows that he

10  participated, in the HPD reports via a call that Tanisu

11  Madrigal was on.

12      The witness briefly mentioned the Defendant's name,

13  and his known co-Defendant, Julius Moore, and he briefly

14  mentioned the auto theft.  And so we would submit that to his

15  risk of flight as well.

16      The fact that he evaded law enforcement and had to

17  cause law enforcement pursuit that culminated in a 45 day

18  sentence resulting from a February 4th incident.  And so with

19  that, we submit he has not overcome his rebuttable presumption

20  of flight risk or danger.

21      And even if he has, we would submit that under Fifth

22  Circuit case law, that rebuttable presumption is still a

23  factor that the Court ought to weigh in deciding whether or

24  not to issue bond.

25      THE COURT:  Thank you.  Mr. Adler?

1          MR. ADLER:  Judge, given the fact that Mr. Lopez

2     came over from state court, I would like him to stay in

3     federal custody so I'm not asking the Court to set conditions

4     of release --

5          THE COURT:  All right.

6          MR. ADLER:  -- at this point.

7          THE COURT:  Thank you.  I do find that the Defendant

8     has failed to rebut the presumption that his release poses a

9     danger to the community, and serious risk of non-appearance.

10    I thought even had Mr. Adler argued for release, and if the

11    Defendant were not currently in state custody and here on a

12    writ, I would still find that the evidence before me

13    demonstrates both clear and convincing evidence of danger, and

14    a preponderance of the evidence of risk of flight.

15         And most importantly, I've got evidence that

16    demonstrates that Mr. Jordan Lopez failed to comply with other

17    bond requirements in the past which is a sure sign to me that

18    there are no conditions that I can set that would reasonably

19    address the danger to the community or the risk of non-

20    appearance.

21         So therefore, I am remanding Mr. Lopez to the

22    custody of the U.S. Marshals, and you will remain in the

23    custody of the U.S. Marshals until your case is resolved.

24         Understood, Mr. Lopez?

25         DEFENDANT LOPEZ:  Yes, Your Honor.

1      THE COURT:  All right.  Anything else we need to

2  handle today?

3      MR. MEGGALI:  No, Your Honor.

4      THE COURT:  Okay.  You all are excused.

5    (Proceeding adjourned at 11:06 a.m.)

6                    *  *  *  *  *

7      *I certify that the foregoing is a correct transcript*

8  *to the best of my ability produced from the electronic sound*

9  *recording of the proceedings in the above-entitled matter.*

10    */S./  MARY D. HENRY*

11  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

12  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

13  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

14  *JTT TRANSCRIPT #69232*

15  *DATE FILED:  NOVEMBER 18, 2024*

16

17

18

19

20

21

22

23

24

25